Oral argument not to exceed 15 minutes per side Mary Ann Dugan for the appellant Mary Ann Dugan for the appellants Larry Klein and Sierra Club. I have advised the clerk I would like to reserve five minutes for a rebuttal. I guess first I'd like to just point out one thing which is doesn't appear to be disputed by any party which is that plaintiff Larry Klein has sufficient injury in fact to establish Article 3 standing because of his He lives close to the proposed plant. He suffers from asthma. There's undisputed air impacts and so there's sufficient injury. Let me ask you a question. According to the Sierra, your client, Sierra Club's website they're very much in favor of cellulose ethanol if the growth in the wood is sustainable. Right. You agree to that? Correct. I believe that the Sierra Club's official position is they do support a wide range of renewable resources including cellulosic ethanol if it's environmentally sustainable. You think that the Frontier Project here, the tree program is not sustainable? No, your honor. That is not the issue before the court. The issue before the court. I'm just asking you the question. Whatever the issue is before the court, whether you think that the project here, the Frontier Project, the growth of the forest, regrowth of the forest presents a sustainable program. It's certainly ecologically sustainable in that when you cut down a tree, replant a tree, a tree will grow back likely. However, that does not answer the question under NEPA, the National Environmental Policy Act, which is did the government adequately disclose the environmental impacts of cutting down that volume of wood, bringing it in on Sustainability is not an issue with you at all. No, I think sustainability is kind of a buzzword that's used a lot these days by Sierra Club and other entities and the media. It has meaning. It has a good purpose, doesn't it? It does. I'm not against sustainability. But that is not the issue before the court with respect. What do you see the issue is? Well, the issue is, you know, NEPA was there's something very important to understand about NEPA. NEPA does not mandate any environmental outcome despite its grand name, which is the National Environmental Policy Act. All it requires is disclosure of impacts, analysis of those impacts, and then taking public comment, including comment from scientists often. And then a decision is made by the government. They can pick the environmentally worst decision, and there's no claim under NEPA. NEPA allows only procedural claims for failure to adequately disclose the environmental impacts of the project. Here we're in the odd position where, somewhat odd position at least in my experience, of where the main issue before this court is standing for the plaintiffs to even raise these claims, which we have set forth the substantive claims because you are allowed to reach them. Get over that and get to the environmental assessment. What's wrong with that? Environmental Why doesn't that set out sufficiently the situation which is that sustainable growth is present? There are many problems under NEPA with the environmental analysis if you do What do you think the worst problem is? I think the main problem that I see based on NEPA case law is that the range of alternatives that is addressed is inadequate. The NEPA case law and the NEPA statute itself explain that the alternatives analysis is the heart of the environmental analysis. When Congress enacted NEPA in 1976, they came up with this concept of requiring the government to address a wide range of alternatives to the proposed action, then compare the impacts of those alternatives, disclose that to the public, and take meaningful comment. Here, the only two alternatives are the proposed action and no action. The no action alternative is required under NEPA in any NEPA analysis. So there's no range of alternatives here. This is so abstract, I'm having a hard time. What would be concretely the alternatives that you would suggest? Congress did not mandate to go build a wood-based cellulosic bio-refinery plant, much less bio-ethanol plant in upper peninsula of Michigan. The Energy Department came and solicited Mascoma and Frontier for this particular grant, did not look at a range of alternatives for reaching the goals that Congress had set. What do you mean by that right there? Range of alternatives in terms of another type of plant? Yes, Your Honor. There's a couple of different issues. Congress mandated cellulosic ethanol, but when they did so, they explicitly said, including switchgrass, biomass that's on the ground, I mean, there's various ways of making cellulosic ethanol, not just cutting down live hardwood trees, much less two-thirds of the net annual growth after removals in the upper peninsula of Michigan. Congress didn't say, look at- The Department of Energy should have proposed the alternative of not having wood chips, but some other food source. Eat stock, yes. That's one of the alternatives. Even though they made up their minds they wanted to do it with wood chips, and your organization, the Sierra Club, approves of that. You say they, as a matter of law, they had to propose something other than wood chips. Well, Sierra Club doesn't explicitly say we like wood chips as the feedstock, first of all. Second of all, Mascoma is the creator of the chemicals that are used in this particular type of plant. They're the ones that wanted to do this type of plant, not the Department of Energy. So, number one is- Isn't it implausible that this program would not allow for a wood chip plant? I mean, I get the idea there are other ways to do this, but I'm just really puzzled by this idea that, as I hear you, you're saying that through this process they should have said wood chip plants are out, we're going to do switchback grass, we're going to do- Is that really possible? No, not that wood is out. If you're going to do wood, you're going to do it in places like the upper peninsula, so I'm just struggling- Congress didn't say use wood. Congress said use- So that's your point. They shouldn't have a wood chip. That's really not an option, is your view. No, absolutely not. I'm not saying that's not an option. I must be misunderstanding. The point of NEPA is to address a range of reasonable options, including a smaller plant, a plant that isn't going to require so much air pollution, so much trucks and trains in and out of the plant, that won't require cutting down this massive- We don't know that, and that's the second problem with the NEPA analysis, is that when the project changes significantly, NEPA requires a supplemental NEPA analysis to address the new information. So in light of these concerns, walk me through your procedural standing analysis. Thank you, Your Honor. The main problem is that the court applied the wrong test for redressability. On its page ID 865, the court said the plaintiffs failed to explain how their use of forests, which are already used to generate hardwood, pulpwood, will be affected by the project's use of those forests for the same purpose. Plaintiffs are unable to demonstrate causation. And then he went on to address redressability. The court said, this is page ID 867, the plaintiffs failed to demonstrate the existence of a genuine issue of material fact with regard to whether the project could proceed without government funding. They have not met their burden of establishing redressability. First, that is the wrong test. It's the wrong burden to be applied. The question is, first, whether there's injury in fact, which is undisputed. And then, second, whether under NEPA, because it's procedural, the redressability test is whether federal analysis could make a difference in the government's decision. But what about the evidence that said this project was economically sustainable without the DOE grant? It said could. The project could proceed. Fine, but there's no opposing evidence. I mean, they're allowed to put that on, and then you're allowed to come back and say, well, could's not enough, and let's get some more evidence. I just felt like you didn't do anything in response to that. We're applying the wrong test when we go down that road, because the test is, and this is in our brief at page 27, the plaintiffs who show inadequacy of the environmental analysis by the government need not show that further analysis would result in a different conclusion. It suffices that the government decision could be influenced, the government's decision, not whether the plant goes forward, whether the government funds the plant. Let me just make sure I'm getting the point. If hypothetically the evidence in this case had said, we the people that want to put this plant together do not need this money, we are going forward regardless of whether DOE gives us money, your view is they're still standing to challenge it? No, they did not say that. No, no, no, but I'm asking you a hypothetical. Hypothetically, the evidence is we're going forward with this plant regardless of whether DOE gives us the money. Your view is Sierra Club still has standing? There are cases that say that Sierra Club would still have standing. And that's because of what? How does that work? The government is still making a decision as to what to do with the government's, the public's money. And the public has the right to require NEPA analysis for that funding decision. I see that I'm out of time. May I conclude? Yeah, yeah. Thank you. And I did cite cases on both sides of that particular issue. So what's the best case to support your position with the hypothetical I asked? There is a case from Oregon, which I cited, I believe, on page somewhere in the 20s, maybe 28. It's the case involving- Standing goes to challenging the use of this taxpayer money. I take it that's the idea. Well, it's not taxpayer standing per se. It's not generalized taxpayer standing. Standing requires a particularized injury in fact, which we do. So injury in fact plus the spending of government money. Significant enough federal funding will federalize the project. Even if, in most of the case law, even if the proponent, the applicant, insists that they will go forward with or without federal funding, most courts have said that we still have standing. However, that's not the issue before this court because the only evidence in the record is that Mascoma said we could go forward. I hear you on that. Thank you, Your Honor. Otherwise the danger, as everybody says, come to the government and give me a whole lot of money. But if you don't, then I'm going to do it on my own anyway. And that would defeat standing every time? Is that the conceptual problem? I think that's the problem. And there are a couple of courts that have gone that way at the district level. I'm not aware of any appellate cases that have gone to that extreme of denying standing when the applicant makes a self-serving statement that it doesn't need the government funding it just asked for. Thank you, Your Honors. Okay, thank you. Okay, is it Mr. Gunter? Good morning. David Gunter from the Department of Justice here on behalf of DOE. With me at council table is Janet Masters from DOE Office of General Counsel and Dan Ettinger, who's representing Frontier. The key point that I'd like to make this morning is that this is not a government project. Frontier is participating in a DOE program, a broader DOE program, to encourage the development of alternative fuels and reduce greenhouse gas emissions. But DOE's decision here doesn't authorize the cutting of any trees. It doesn't authorize any construction. It doesn't permit any emissions or fill any wetlands. It is just that the DOE's decision relates to whether you get $100 million, correct? It does. It's about $80 million at this point, yes. Because you've already gotten $20? No, because at the moment DOE has committed to provide $80 million if Frontier constructs the project as outlined in the EA. And it could go up to $100 million. But DOE has not decided yet on that last $20 million, has not committed that last $20 million yet. So, yes, there's a lot of money at issue here. But it's still a Frontier project. Plaintiffs haven't shown that Frontier would abandon the project without that money. I mean, it's both the government and the private enterprise government thing. Now, let me ask you this. In this particular area where the trees are going to be cut for the project, and it's a large area, but how many acres is it, 83,000? I think it's 8.3 million acres in the 150 square miles around. 8.3 million, okay. I'm sorry, not 150 square miles, 150-mile radius. Radius. Now, are there going to be other groups that are going to be cutting trees within that same precise area? Do you predict that? Well, the only people that will be cutting trees in that area will be the private suppliers of timber and wood products in this area. Frontier and DOE will not be cutting any trees. But Frontier and DOE will be buying feedstock from the suppliers who are cutting trees in that area. And they would be cutting trees not only for Frontier but also for dozens of wood consumers in the area. But this plant will increase the demand, so presumably there will be more trees cut. It will increase the demand, but the analysis in the EA shows that not necessarily will more trees be cut. There are a number of factors that go into how much wood is harvested, including timber management practices in the area, what the price of wood is, how many other consumers are there. So the timber supply outlook that Frontier provided to DOE indicated that the prices of wood goes in a cycle over several years. And at the end of this particular study period, 2006 to 2008, prices were a bit down because of the departure of two major wood consumers in the area. DOE found that the Frontier feedstock could be taken entirely from the wood that would no longer be used by those facilities. But that doesn't necessarily mean that... Can you respond to Ms. Dugan's point? It seemed to be maybe her principal argument on the merits, which is the alternatives, that you seem to be looking at this through the lens of whether to fund it or not, and case law and the regulation seems to require a more wide-ranging inquiry. Sure. Let me first put this in context. Actually, Judge Merritt said that it's a semantic difference between a government program or a Frontier project, and I don't see it that way at all. There is a broader DOE program for which Congress appropriated $778 million to encourage the development of cellulosic ethanol. That's what I would describe as the DOE program. And for that, DOE solicited dozens of proposals and reviewed them and chose about ten. Frontiers was one of them, but those ten proposals do cover a broader range of types of feedstock, types of plant, et cetera. But the question before DOE... How many of the ten were woodshed-based? I don't know that off the top of my head. But at any rate, the NEPA question that's before the court today and the decision that DOE had to make in this environmental analysis was whether to fund this particular project. And it saw that as a yes or no question. Now, that doesn't mean that DOE didn't consider any other alternatives. In Save Our Cumberland Mountains, the court said that an agency can't treat the question of alternatives as a strict yes or no. But it also upheld, in that case, OSM's decision to have only two principal formal alternatives discussed in the EA because the course of the NEPA project showed that it had actually analyzed different types of alternatives for the mining project it issued there. How would you, in a project like this, how can sustainability be assured through some mechanism if there are going to be a lot of people cutting down trees, and one of which will be this Frontier project, but you don't know how many other people are also... How can you, therefore, assure any sustainability of the forest for the purposes of this cellulose wood project? A few different responses to that. And first, it's important to note that Frontier is not cutting any trees. It can only control its own procurement process. But DOE required Frontier to have a sustainable forest initiative procurement process where it would... It required... One of the mitigation measures in the EA is that Frontier must set up a sustainable forest initiative, SFI, procurement process that buys... That was part of the mitigation, and it's... Does everyone agree that that's an enforceable requirement, correct? You take the position that mitigation is an enforceable requirement, right? Yes. I don't want to speak for plaintiffs because I think they may dispute it. But DOE's position is that if... It's in your contract. It's in the contract. If Frontier doesn't do it, then they don't get the money. I'm struggling a little bit with the conceptual basis that NEPA... The conceptual basis of NEPA because the goal is for the government just to go out and collect information. I understand and I think we all recognize the point that it's not to say yes or no, you must take this kind of project or not that kind of project. The whole goal of NEPA is to collect information and then to share that information with the public. I guess I'm looking at the forest resources sustainability, and I want to make sure I've not missed something in the report because it seems to me there's a piece of information that's missing even though it's requested. Even though the environmental assessment talks about the need for it, over on 634 of the wood... Please feel free to grab it because I'm hoping that you're going to tell me where it is. Because I can't find it. The appendix 634 which is part of your environmental assessment and it's under your category of forest resources. What I'm seeing is that you went back to 2000 to 2010 and you said, let's look at plants that used to use wood that aren't anymore because a very fair idea, this is just substitute use of property. And on table 35 you gave us all of those, all the mill closures in the Kenross area. And then the next page, the 634, you give us the new or planned wood using facilities. And you say at the end of your introduction, in total these new and proposed facilities will require significant amounts of wood, quantifying wood requirements for these facilities will be necessary to assess the sustainability of wood flows from Michigan's forests. And then you give a table 36 with nine new facilities that will be using wood also. I can't find in here where you assess how much those new facilities will be using. Am I missing something? No, I don't think you are missing anything. And I'm sorry, I don't know the current status of those projects that are listed in table 36. But I do know that that report is from December 2010. And the EA here was dated in 2011. So DOE had to make a decision. Can you point me to where in the EA that was discussed? Because what I'm seeing is you're saying, let's find a baseline. And the baseline begins in 2000. And we're going to consider all the places that closed because now that substitute usage won't take any more trees. And then you tell me, I've got nine more projects, a number of which I looked up and they're built and underway. And you say to us, we've got to assess the sustainability of wood flows for these projects. But I can't find where you told me how that impacted the decision. I don't think that the EA actually tries to quantify the wood that will be used by additional projects that may open in the area in the near future. But you're quantifying the wood that's no longer used by plants that's closed to justify your sustainability. So how can you not use the known projects when you decide whether it remains sustainable in wood usage? A few thoughts on that. One is that the lost demand from plants that have closed is certain. And the potential future plants are uncertain. Another one is that the frontier plant could use all of the wood that is no longer demanded by the closed plants and still have some left over for other projects. And finally, a more general point, because I don't think that this issue is quantified in the record, is the EA and the Timber Supply Outlook both state that demand for wood and wood products in this area is cyclical. It goes down sometimes, it goes up sometimes, and the end of the study period, 2006 to 2008, was a down period. We can certainly expect that it will go up. All of the participants in this industry, including the state of Michigan, want additional market entrants now to satisfy the excess capacity that is available with the closure of these plants. So I don't think that it's necessary to say that no matter who else opens, all of the wood that Frontier and all of the other users need will be satisfied out of existing removals. I think instead it's important to look at the context of the cyclical market. There are questions there. Could you come back, and I've got a few questions too I want to ask. Let me conclude. I just have one more on that same kind of conceptual basis because it seems to me this relates to standing. I'm looking at the air quality in your same report, and you've got the Chippewa County air quality, and when you go to your Table 3-9, you've got the ceilings on what can make it noncompliant anymore. With the Frontier project, you're at 33.2 of these particulate matters. This is your expertise, not mine, but the ceiling is 35. I see once again the same sort of question in my mind about these other projects that are already in existence and being used not being calculated. And to me, I guess I would ask you to bring that back to standing because if I have... Go ahead. Answer the question. Oh, yeah. Give me an air one. Let me answer that specific question first. First, with respect to air quality, our view is that the air quality impacts are one of the things that gives the individual plaintiff, Mr. Kline, injury sufficient to show standing. It has nothing to do with the amount of impacts. But the other point about that and the potential for entrance into the market that may reduce that margin between existing and the cap is the point of the EA is that the air quality impacts will be not significant here because that entire process being managed by the State of Michigan in its air permitting. That air permitting can't allow overall emissions in the area to exceed the national ambient air quality standards or to exceed Michigan's limits for toxic air contaminants. So it will be up to the Michigan Department of Air Quality, it may not be its proper name, but to those regulators to ensure that air quality stays below the caps that Michigan has set. And if it does, the EA finds that there won't be a significant impact. I do want to get to standing, but I also want to... Let's go to Judge Merritt first. Is that all right? Judge Merritt's got a couple of questions. Yeah, go ahead. Yeah. How does the government propose itself or through Frontier to enforce the sustainability goal? That is to say, if that's the goal or one of the major goals, how are you going to ensure that it occurs? And should not the method by which you do that at least be set out or described in some way in the environmental assessment? Or if not there, then go forward with an environmental impact statement that would set that out? The method is to enforce the Sustainable Forestry Initiative requirement on Frontier. As I said before, Frontier can't manage overall sustainability in the area. It can only manage its own procurement process. But DOE has attached a string to the money. How does your delegate there, Frontier, propose to do that? Well, the Sustainable Forestry Initiative is an existing program in Michigan. And the EA states that most of the suppliers in the area already use methods for harvesting timber that comply with the Sustainable Forestry Initiative. So Frontier would only buy... The short answer is you're going to lean on the state of Michigan to enforce that. I thought the answer was that Frontier was only allowed to buy from such suppliers. That is the case. And so certainly for purposes of Frontier, that's the answer. I understand Judge Merritt to be asking more broadly how all of the suppliers in the area maintain a sustainable level of harvest. And I think that's a broader... And you also have your contract. Yes. You have the contractual provisions with Frontier, and you can say to Frontier, you don't buy it unless it's sustainable. That's right. And I would also add that half of the land in the study area is owned by either... How are they going to know whether it's... I mean, nothing is set out that I can see in the environmental assessment about how this is going to be done except you're going to rely on the state of Michigan to enforce a sustainability growth plan. Is that correct? Yes, but there's also... That's the only enforceable mechanism. There's also analysis in the EA to suggest that that will happen, that our projections are that removals will continue to be sustainable. And as Ms. Dugan said, there's room, even if the Frontier project were all new harvest, it would not... The amount of timber stock in Michigan would still be increasing on that. I want to make sure I understood your answer to what I said before. I thought I said... I thought you said before that a way in which to answer Judge Merritt's question is that the contract requires Frontier only to buy from timber producers that are complying with the sustainability rules. Yes, that's my understanding. That has nothing to do with just relying on the state of Michigan. Yes. Because it's saying if Frontier's going to do this, they can only buy from these types of producers. Yes, that's my understanding. And I would also add that half of the land in the study area is either state or federal land, all of which would require additional environmental analysis and review before any timber can be removed. Isn't that what, in a procedural injury case, provides standing? Because in this situation, you have the ability through your contractual relations  And if you can require mitigation, you can redress the harm. So why isn't there standing? The question is not whether DOE can redress the harm to the environment from the removal of timber. Right. The question is whether this court can redress the plaintiff's injury. And on that, I would direct the court to the D.C. Circuit's opinion in St. John's. Ms. Dugan argues that there is a relaxed standard of redressability here. Well, Lujan tells us that, doesn't it? It tells us that for cases in which the plaintiff is injured by the government's behavior. If the plaintiff's here were injured by DOE's action, then yes, DOE could reconsider that action, reach a different decision, and then the plaintiff's injury would be redressed. Then isn't underneath that the essence of the harm? What the plaintiffs are asking is that you provide sufficient information to the public and to DOE that you get that information together, and then you use that information to make an appropriate environmental decision. And the way DOE is involved is after collecting all that information correctly, then they can implement changes to the project through mitigation measures. So the collection of information... The process is the injury. Yes. The process is the injury. That is the answer to that. Yes, that is the essence of the injury. The injury is procedural. Right. But what we're asking the court to focus on here is not the injury. It's the redressability. If the court ordered DOE to go back and make a different decision, then DOE could decide not to give Frontier this money at all. But the question then is what happens? Plaintiffs haven't shown that Frontier, as a result, would abandon the project. It's entirely possible that the project would be built. That is one part of the case that strikes me as tricky and maybe unfortunate in terms of the fact there could have been more discovery. But the best evidence on this point for your side is that it says it could go forward without DOE money. It doesn't say... The Board of Directors has said we're going forward with this no matter what. So how do we deal with... Because that first setting would be a lot easier, it seems to me, for the argument you're now making. But that's not the facts. The facts are could. That's true if it were the defendant's burden to establish facts supporting standing. But the Supreme Court has made clear in Lujan that it's the plaintiff's burden. And at summary judgment, under Celotex, it's the plaintiff's burden to develop evidence to suggest that there is a genuine issue of material fact about this. So when the D.C. Circuit and the District of D.C. considered this question in St. John's United Church of Christ and in Sierra Club v. DOE, both of those courts said it's the plaintiff's burden and the plaintiffs haven't met their burden. So regardless of what the injury may be, there's no redressability. What we're asking the court to do here is simply adopt the same reasoning. I think we understand that. Judge Merritt, have you gotten all your... Do you have any others you want to... Um... I guess I just don't feel like I've gotten an answer to my concern that... Or my... What appears to me to be the law under NEPA is that there is redressability if you collect the appropriate amount of information, which is the job, and provide that, because then DOE is in the position of doing exactly what it did here, requiring mitigation. And why doesn't the fact that you have now said, in this project, under our contract, you shall use sustainable forestry, that redresses an injury? In our view, that should redress plaintiff's harm. The trouble is they disagree and they've asked the court to resolve the question. And so the question is whether the court can do something. But then if you can, it's redressability. So if you can redress it, they have standing. Correct? No. I'm sorry, Judge Strange. I just disagree with you that it matters whether DOE can redress it. To me, it matters whether the court can redress it. The court certainly could order DOE to go back and redo its NEPA analysis, could even vacate DOE's funding decision, and DOE could reach an entirely different decision on the funding. It could say, no money for Frontier. But the question about whether the court can redress plaintiff's injury, plaintiff's injury comes from Frontier's construction of the project, just like the injury in St. John's came from the construction of the runway. Her injury comes from how the project is entered, not that the project is entered. If that's your... Which is a DOE issue. If that's your concern, then I would recommend the Supreme Court's decision in Summers, which says that under NEPA, it's not enough to have a procedural injury in vacuo. The plaintiffs can't sue just on the error in procedure. They also have to connect that to some kind of concrete interest they have. And in this case, the concrete interest is in trying to prevent the plant from being built. So the question for the court... Well, that's what you say. That's not what she says. But the point Judge Strange is making is, you know, if you look at the way it works now, and this is why it really wasn't a yes or no option, because it was, yes, contingent on these things. And so some of these mitigation measures, they may still be challenging this. That's true. But there is this point that some of these mitigation measures are redressing some injury. They may not be redressing enough for them to say, okay, fine, we're not going to litigate anymore. But I think that's the point she's making, which, I don't know, doesn't that add a complication? I don't think so, because, again, you're talking about whether DOE, through its action, is able to redress plaintiff's injury. DOE is trying to redress all injuries that are resulting from the environmental impacts by, for example, imposing mitigation conditions. But once DOE has decided its entire slate of mitigation measures, then it has to make the decision. Well, I see your point. Your point, they're not filing this lawsuit to ensure that what's been redressed stays redressed. That's right. They're filing this lawsuit to get rid of the whole thing. Now that makes sense to me. I get it. That's right. They don't agree that DOE's action redresses their injury. They still say, even with the project as it's described in the EA, they're still injured. So the question is, do we need to go back and... We have to assess redressability with respect to what they still want. It's what they still want that is the lens. That's right. What they want to do was to have an environmental impact statement. Yes. Isn't that right? Yes. So the court could... The result they want to reach is for this court to order the Department of Energy to provide an environmental impact statement, right? That's the procedural result that they want to reach under NEPA. But their concrete injury, the type that the Supreme Court described in Summers, of the type that if you have a standing affidavit, it's like, I go out and I enjoy the trees and I don't want them to be cut down. That is a concrete injury independent of the procedural injury. And the Supreme Court says, even in a procedural case, you have to have some kind of concrete injury like that. There is a plan. Frontier's plan. It's not what DOE's done. That's right. Their concrete injury comes from the construction of this plant and from the cutting down of trees to use as the feedstock. And so apart from the EA-EIS issue, they have to be able to show that that injury would be redressed if this court vacated DOE's funding decision. They have the burden to do that. They didn't seek discovery. They didn't introduce evidence. They didn't create a genuine issue of material fact. All right. Well, thank you very much for your argument. Ms. Dugan, you've got some rebuttal time. Thank you, Your Honor. Go ahead. First of all, I need to point out in NEPA there is no discovery. It's under the Administrative Procedures Act. We are denied discovery entirely. Secondly, we are not filing suit to get rid of this plant. Can I ask you a question about that? Yes. So when there's a summary judgment motion filed in district court, you're not allowed discovery? No, Your Honor. It's based on the administrative record, which, as you can see, was voluminous in this case. And as far as standing, what the Supreme Court has said is we are allowed to submit affidavits and declarations. We don't get to take depositions and do document requests. No subpoenas, no nothing? No subpoenas, no interrogatories, nothing like that. And is there a case that says in light of that process, we look at standing through a different lens? Not that I'm aware of. And, you know, it was occurring to me as I was sitting there that I've actually never had to address that particular argument. I think it's an interesting one, and I suppose somebody could make an argument for a discovery period for standing where there's a clear challenge to standing, but I don't know of any case that allows for discovery in any APA case. If there is discovery, because of my suspicion, in fact, not suspicion, pretty strong view is it would be utterly bizarre that the APA could dictate to a federal district court what Rules 26 through 37 mean in the context of a debate about Article III standing. It just doesn't make any sense to me. If it's true that you can get discovery about standing in a federal district court, is that, I mean, that's, well, I guess it's a problem. I don't know what to say. It's too late. Well, I've never seen, I've done this for 20 years, and I've never ever seen discovery. I'm just giving you a great idea. I think it is a great idea. The trip to Cincinnati was worth it. Absolutely. The Full Employment Act for NEPA attorneys. Also, we're not filing suit to get rid of the project. As Judge Merritt pointed out, we're suing to get better NEPA analysis, either a full EIS or a better environment. Doesn't the redressability have to be connected? I mean, you started out by the agreed injury in fact, and the agreed injury in fact was to decline. It wasn't about process. Don't you have to connect redressability to that injury in fact? Well, the case law we cited on page 27 through 29 of our brief makes clear that the issue is not whether the project will not go forward, but whether the government's analysis could end up with a different government decision. I know it's a little odd to think of this in the abstract, but it's because it's NEPA and not the Clean Water Act or the Clean Air Act, which has a substantive component. The only test for redressability, which the courts have said is relaxed in NEPA cases, that's on page 29 of our brief, is whether the government decision could be influenced by better NEPA. And I would also like to point out that the Department of Justice admitted in their answer at paragraph 3 that this is a cooperative agreement between the federal government and Mascoma Frontier. This is the government seeking out a company to do what they called a demonstration project as mandated by Congress. And Congress mandated not cellulosic ethanol. The grant is, as Frontier admitted in their brief at page 9, the grant is for cellulosic ethanol and other renewable fuels. And the Department of Justice attorney just explained that DOE solicited a large range of projects. The NEPA analysis certainly could have addressed that range and said, here's the projects we're selecting, here's why they meet the purpose and need of the act as written by Congress. And on page 9 of our brief, I laid out all of the ways in which the government is actually a partner in this project. They're not just writing a check. They're showing up at meetings. They have an independent engineering firm to review the project. As it goes on, they're doing site visits. They're providing technical assistance. They're doing risk analysis. And so, I mean, there's a whole list. It goes on for a page and a half. They're only doing it because Congress told them to do it, right? Pretty much. I think that's how the executive branch works generally. But, yes, that's true. The NEPA injury does flow from the failure to evaluate impacts. Summers did not change that, the Supreme Court case in Summers. Summers was about whether there was sufficient likelihood of injury to that particular party. And here we have undisputed injury, in fact, to Mr. Klein. I'd also like to point out that the government, the Department of Justice, has not challenged that this project is federalized. It's sufficiently federalized, although Mascoma does. And federalization, that's when a private project requires NEPA. And this court in Southwest Williamson County case, which is cited at pages 25 to 26 of our brief, stated that there's two alternative tests for federalization. One is when a non-federal project restricts or limits the statutorily prescribed decision maker's choice of reasonable alternatives. So here Congress said, go find some renewable energy projects. Mascoma says, well, here's how we want to do it. We make these chemicals that break up the cellulose, and we want to log trees. The other test is where the federal decision makers have authority to exercise sufficient control or responsibility over the project. And here we've listed those ways. Thank you, Your Honors. And I ask that you reverse the district court. Thank you. Thanks to both of you for your excellence briefs. We really appreciate it. It's a complicated case. And thanks for your excellent oral arguments and for answering our questions. Thanks so much. The case will be submitted, and the clerk may call to order.